**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| YAQOUB AYYAD and RAYMOND LONG, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NAYAX, LLC, <br><br> Defendant. | Case No. 1:26-cv-2946 <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

1. Plaintiffs Yaqoub Ayyad and Raymond Long ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Nayax, LLC ("Nayax" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

2. This class action arises out of Defendant Nayax's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiffs' and Class Members' sensitive personally identifiable information that it had acquired and stored for its business purposes. This failure to secure and monitor its network and cloud environment resulted in a 2026 data breach ("Data Breach") of highly sensitive information stored on the computer network and cloud environment of Nayax, a global financial-technology company that provides cashless payment, IoT, and management solutions for unattended and self-service retail—including vending, kiosks, car washes, laundry, parking, fuel, and electric-vehicle charging—and related consumer-facing

products such as its Monyx mobile wallet, to merchants, businesses, and consumers across the United States, including Plaintiffs and Class Members.

3.      Defendant's data security failures allowed a targeted cyberattack that came to public light in or about July 2026 to compromise Defendant's network and cloud environment (the "Data Breach") that contained personally identifiable information ("PII" or "the Private Information") of Plaintiffs and other individuals ("the Class").

4.      Upon information and belief, a threat actor gained access to Nayax's inadequately protected cloud environment and, over an extended period, accessed and exfiltrated a large quantity of highly sensitive data belonging to Nayax and to its customers and their consumers. On or about July 7, 2026, the threat actor publicly claimed responsibility for the attack on a cybercrime forum, asserting that it had exfiltrated more than 100 terabytes of data—including payment card data, customer and cardholder records, transaction histories, "Know Your Customer" (KYC) information, source code, and internal company information—and established a dedicated leak site threatening to publish the stolen data.[1]

5.      On or about July 8, 2026, Nayax publicly acknowledged a cybersecurity incident in a filing with the U.S. Securities and Exchange Commission, stating that it had detected anomalous activity within a cloud account belonging to one of its subsidiaries. As of the filing of this Complaint, Defendant has not provided direct notice to affected individuals identifying the specific categories of their Private Information that were accessed and taken.[2]

6.      The threat actor associated with the attack, known as 0APT Syndicate, is a ransomware and data-extortion group first observed in or about January 2026 and tracked by

---

[1]   https://breachnews.com/breaches/nayax-allegedly-breached-with-payment-card-and-customer-data-claimed-stolen/ (last visited July 29, 2026).
[2] *Id.*

cybersecurity researchers. According to open-source tracking resources, 0APT Syndicate operates as a ransomware-as-a-service and data-broker operation that employs both direct extortion and "double extortion"—encrypting victim systems while also stealing data and threatening to publish or sell it on dark web leak sites if a ransom is not paid. The existence and persistence of groups like 0APT Syndicate illustrate the scale of the threat that organizations like Nayax have a duty to anticipate and defend against.[3]

7. The types of information that ransomware threat actors of this kind have routinely exfiltrated in their attacks include, but are not limited to, names, birthdates, addresses, Social Security numbers, financial records, customer account credentials, internal corporate data, source code, payment card and cardholder data, banking details, transaction histories, and other personally identifiable information.

8. The information collected and processed by Nayax in the course of providing its payment, wallet, and related services included certain personal information of current and former customers and their consumers, including Plaintiffs. Upon information and belief, this Private Information, stored on Defendant's computer network and cloud environment, included, but is not limited to, full names, addresses, account usernames and passwords, email addresses, telephone numbers, dates of birth, Social Security numbers, government identification information/driver's license numbers, financial account information, payment card and cardholder data, and transaction histories.

9. Upon information and belief, the cybercriminals intentionally targeted Nayax for the highly sensitive Private Information it stores on its computer network, attacked the

---

[3] https://www.watchguard.com/wgrd-security-hub/ransomware-tracker/syndicate (last visited July 29, 2026).

insufficiently secured network, then exfiltrated highly sensitive PII, including but not limited to Social Security numbers. As a result, the Private Information of Plaintiffs and the Class remains in the hands of those cybercriminals.

10.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for business purposes.

11.     Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third party and including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

12.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant Nayax's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

13.     Defendant disregarded the rights of Plaintiffs' and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and

4

reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

14. In addition, Defendant Nayax failed to properly monitor the computer network and systems that housed the Private Information. Had Nayax properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals unimpeded access over the course of several days to the PII of Plaintiffs and Class Members.

15. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant Nayax collected and maintained is now in the hands of data thieves and, upon information and belief, disseminated on the dark web.

16. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

17. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

18. Plaintiffs and Class Members may also incur out-of-pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

20. Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, (iii) unjust enrichment, and (iv) declaratory relief.

21. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief, including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## PARTIES

22. Plaintiff Yaqoub Ayyad is, and at all times relevant hereto was, an individual citizen of the State of Illinois, residing in Lyons, Illinois. Plaintiff Ayyad has used Nayax's services for years and was a customer of Defendant Nayax.

23. Plaintiff Raymond Long is, and at all times relevant hereto was, an individual citizen of the State of Missouri, residing in Independence, Missouri. Plaintiff Long is a customer of Defendant Nayax and uses a Nayax Monyx card for his transactions.

24. Defendant Nayax, LLC is a limited liability company with its principal place of business at 11350 McCormick Road, Suite 1004, Hunt Valley, Maryland 21031. It can be served through its registered agent, CSC-Lawyers Incorporating Service Company, located at 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

26.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in this State; it is registered to do business in Maryland; it maintains its principal place of business in Hunt Valley, Maryland; and it committed tortious acts in Maryland.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which Nayax maintains its principal place of business and has the most significant contacts, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

28.     Defendant Nayax is a global financial-technology and commerce-enablement company that provides cashless payment, IoT, and management solutions for unattended and self-service retail. Nayax offers a suite of payment devices, software, and services used across vending, micro-markets, car washes, laundry, kiddie and amusement rides, parking, fuel, transportation, and electric-vehicle charging, as well as consumer-facing products such as its Monyx mobile wallet.

Nayax describes itself as a global fintech company providing a comprehensive operating system and payment platform for merchants and retailers.[4]

29.    Nayax was founded in 2005 and, according to its public statements, operates globally with hundreds of employees and tens of thousands of customers worldwide. Nayax is a publicly traded company, listed on both the Nasdaq (NYAX) and the Tel Aviv Stock Exchange, and its North American operations are headquartered in Hunt Valley, Maryland.[5]

30.    In the ordinary course of their relationships with Defendant Nayax—whether directly or through Nayax's payment, wallet, and related Services used at merchants and businesses—Plaintiffs, like other customers and consumers, provided (or caused to be provided to) Nayax sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

- Payment card and cardholder data;

- Transaction and purchase history;

- Demographic information;

- Driver's license or state or federal identification;

- Account credentials, including usernames and passwords;

- Government-issued identification information; and

- Banking and/or credit card information.

---

[4] https://www.nayax.com/about/ (last visited July 29, 2026).
[5] *Id.*

31.    Nayax had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from unauthorized disclosure to third parties.

### *The Data Breach*

32.    A data breach occurs when cybercriminals intend to access and steal Private Information that has not been adequately secured by a business entity like Nayax.

33.    Upon information and belief, Defendant experienced a cyberattack on its computer systems and cloud environment by the threat actor 0APT Syndicate, which maintained access over an extended period before exfiltrating a large volume of sensitive data from Nayax's environment. Upon information and belief, the threat actor publicly claimed responsibility for the attack and posted information regarding the exfiltrated data on the dark web for sale/ransom following the Data Breach.[6]

34.    Defendant has yet to provide direct notice to affected individuals of the Data Breach that was publicly disclosed in or about July 2026.

35.    As of the filing of this Complaint, upon information and belief, the required State Attorneys Generals' notices have not been sent, nor have customers and employees received direct notice of whether their Private Information was breached and exfiltrated.

36.    Since the Data Breach, according to cybersecurity news sources, the ransomware group 0APT Syndicate has claimed responsibility for the attack and allegedly posted stolen files as proof.

37.    Nayax's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

---

[6] https://breachnews.com/breaches/nayax-allegedly-breached-with-payment-card-and-customer-data-claimed-stolen/ (last visited July 29, 2026).

38.     Nayax knew or should have known that its electronic records would be targeted by cybercriminals.

39.     Nayax had obligations created by FTCA, contract, industry standards, common law, state law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

40.     Nayax's own Privacy Policy expressly acknowledges its duty to protect the personal data of individuals with whom it conducts business. The Policy states that Nayax "implement[s] extensive security measures to reduce the risks of damage, loss of information and unauthorized access or misuse of personal data," and that it "implement[s] appropriate data collection, storage and processing practices and security tools to protect personal data against unauthorized access, alteration, disclosure or destruction."[7]

41.     Despite these express representations and commitments, Defendant Nayax failed to implement and maintain the very safeguards it promised, directly resulting in the unauthorized access and exfiltration of Plaintiffs' and Class Members' sensitive Private Information by the threat actor 0APT Syndicate in 2026.[8]

42.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

### *Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' PII.*

43.     Nayax acquires, collects, processes, and stores a substantial amount of personally identifiable information ("PII") of its customers, their consumers, employees, and other

---

[7] https://www.nayax.com/legal/nayax-general-privacy-policy/ (last visited July 29, 2026).
[8] *Id.*

individuals in connection with the cashless payment, mobile wallet, and related commerce-enablement services it provides throughout the United States.

44. By obtaining, collecting, and using Plaintiffs' and Class Members' PII for its own financial gain and business purposes, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

45. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

46. Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice.

47. It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cybercriminals. Companies that collect such information, including Nayax, are well aware of the risk of being targeted by cybercriminals.

48. Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

49. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket losses and any losses reimbursed to the victim. An indirect loss includes any other monetary cost caused by the

11

identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[9]

50.    Individuals, like Plaintiffs and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and are likened to accessing one's DNA for a hacker's purposes.

51.    Data breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

52.    The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other government agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[10]

53.    In 2024, there were a record 3,158 data breaches, similar to the 3,202 breaches reported in 2013. Furthermore, the number of victims affected jumped to 1.73 billion people, which is a 300% increase from 2024 to 2023.[11]

---

[9] "Victims of Identity Theft, 2018," U.S. Department of Justice (Apr. 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited July 29, 2026).
[10] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 29, 2026).
[11]    https://www.cnet.com/tech/services-and-software/near-record-number-of-data-breaches-reported-in-2024-report-says/ (last visited July 29, 2026).

54.    Additionally, "in 2024, healthcare data breaches reached an all-time high, with 276,775,457 compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population." In a new report issued, "more than 2,400 security leaders and found that the top predicted threat for 2025 is ransomware. According to the report, nearly 1 out of every 3 security professionals (38%) believe ransomware will become an even greater threat when powered by AI." This is particularly alarming as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from businesses "lack of cybersecurity expertise and significant security resources."[12]

55.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

56.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[13] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[14]

57.    Despite the prevalence of public announcements of data breaches and data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure,

---

[12]  https://www.forbes.com/sites/chuckbrooks/2025/04/05/key-cybersecurity-challenges-in-2025-trends-and-observations/ (last visited July 29, 2026).
[13]  https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited July 29, 2026).
[14] *Id.*

Nayax failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

***At All Relevant Times Defendant Had a Duty to Plaintiffs and Class Members to Properly Secure Their Private Information.***

58.    At all relevant times, Nayax had a duty to Plaintiffs and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to promptly notify Plaintiffs and Class Members when Nayax became aware that their PII was compromised.

59.    Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

60.    Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

    a.    Maintaining a secure firewall configuration;

    b.    Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

    c.    Monitoring for suspicious or irregular traffic to servers;

    d.    Monitoring for suspicious credentials used to access servers;

    e.    Monitoring for suspicious or irregular activity by known users;

    f.    Monitoring for suspicious or unknown users;

    g.    Monitoring for suspicious or irregular server requests;

    h.    Monitoring for server requests for PII;

i.  Monitoring for server requests from VPNs; and

j.  Monitoring for server requests from Tor exit nodes.

61.  The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

62.  The ramifications of Defendant's failure to keep consumers' PII secure are long-lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiffs and the Class may continue for years.

### *The Value of Personally Identifiable Information*

63.  The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[17]

64.  Criminals can also purchase access to an entire company's data breaches for $900 to $4,500.[18]

---

[15] 17 C.F.R. § 248.201 (2013).

[16] *Id.*

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited July 29, 2026).

[18] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 29, 2026).

65.     Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[19]

66.     Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.     Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

68.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card

---

[19] Soc. Sec. Admin., *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 29, 2026).

[20] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 29, 2026).

information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[21]

69.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[22]

70.    Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

71.    The Private Information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

72.    Moreover, Nayax has failed to promptly notify Plaintiffs and Class Members of the Data Breach and failed to offer any identity theft monitoring or protection.

73.    Defendant expects Plaintiffs and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendant merely expects Plaintiffs and Class Members to know about actions they can affirmatively take to protect themselves.

---

[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited July 29, 2026).
[22] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n.1 (last visited July 29, 2026).

74.     The lack of services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

75.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Nayax's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

### *Defendant Fails to Comply with FTC Guidelines.*

76.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

77.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[23] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating

---

[23] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 29, 2026).

18

someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

78.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

79.    The FTC has brought enforcement actions against businesses, like that of Nayax, for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.    These FTC enforcement actions include actions against businesses like Defendant that collect and store consumer personal information. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

81.    Defendant failed to properly implement basic data security practices.

82.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[24] *Id.*

83.     Defendant was at all times fully aware of its obligation to protect the PII of its customers and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### Defendant Fails to Comply with Industry Standards.

84.     As shown above, experts studying cybersecurity routinely identify businesses that collect and store large volumes of consumer PII as being particularly vulnerable to cyberattacks because of the value of the information they maintain.

85.     Several best practices have been identified that at a minimum should be implemented by businesses like Defendant that collect and store consumer PII, including, but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

86.     Other best cybersecurity practices that are standard across industries that collect consumer PII include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; safeguarding communication systems; and training staff regarding critical security practices.

87.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

20

Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

88.      These frameworks are widely recognized and applicable industry standards for organizations that collect and store sensitive consumer information, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

### *Data Breaches Put Consumers at an Increased Risk Of Fraud and Identity Theft.*

89.      Data breaches, such as the one experienced by Plaintiffs and the Class, are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

90.      In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[25] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* the GAO chart of consumer recommendations, reproduced and attached as Exhibit A. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiffs and the Class) must take after a breach like Defendant's are both time-consuming and of only limited and short-term effectiveness.

91.      The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[26]

---

[25] https://www.gao.gov/assets/gao-19-230.pdf (last visited July 29, 2026). *See* attached as Ex. A.
[26] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited July 29, 2026). ("2007 GAO Report").

92.     The FTC, like the GAO (*see* Exhibit A), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

93.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

94.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

95.     Theft of Private Information is also gravely serious. PII is a valuable property right.[28]

96.     It must also be noted that there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[27] *See* https://www.identitytheft.gov/Steps (last visited July 29, 2026).
[28] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

97.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

98.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

99.    As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft, and data laundering. At least one study has identified the value of a PHI record at $1000 each."[29]

100.    Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[30] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[31] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number

---

[29] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last visited July 29, 2026).
[30] *Identity Theft and Your Social Security Number* at 1, Soc. Sec. Admin. (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last avisited July 29, 2026).
[31] *Id.* at 4.

was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

101.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

102.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[33]

103.    In recent years, industries that collect and store large volumes of consumer personal information have experienced a disproportionately high number of data theft events. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[32] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 29, 2026).

[33] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited July 29, 2026).

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Yaqoub Ayyad*

104. Plaintiff Yaqoub Ayyad is, and at all times relevant hereto was, an individual citizen of the State of Illinois, residing in Lyons, Illinois. Plaintiff Ayyad has used Nayax's services for years and was a customer of Defendant Nayax.

105. As a Nayax customer, Plaintiff Ayyad entrusted Defendant—directly or through Nayax's payment and related Services—with highly sensitive Private Information, including, but not limited to, his name, contact information, Social Security number, and financial and account information. Upon information and belief, this Private Information was maintained within the Nayax network and cloud environment that were subject to unauthorized access and exfiltration in the Data Breach, and Plaintiff Ayyad's Private Information was therefore among the data compromised in the incident.

106. Since the Data Breach, Plaintiff Ayyad has experienced a noticeable increase in spam and other unwanted contacts. After noticing this increase, Plaintiff Ayyad conducted his own research and thereby learned of the Data Breach. Plaintiff Ayyad has not received any direct notification from Defendant to date.

107. Since the Data Breach, Plaintiff Ayyad spends approximately one hour per week monitoring his accounts in an effort to mitigate the risk of fraud and identity theft resulting from the Data Breach. This is more time than he expended before the Data Breach, and having to do so causes him anxiety.

108. Plaintiff Ayyad is aware that cybercriminals often sell Private Information, and that once stolen, his Private Information is likely to be misused for months or even years after the Data Breach.

109.    Had Plaintiff Ayyad been aware that Nayax's computer systems and cloud environment were not secure, he would not have entrusted Nayax with his Private Information.

### Plaintiff Raymond Long

110.    Plaintiff Raymond Long is, and at all times relevant hereto was, an individual citizen of the State of Missouri, residing in Independence, Missouri. Plaintiff Long is a customer of Defendant Nayax and uses a Nayax Monyx card for his transactions.

111.    As a Nayax customer, Plaintiff Long entrusted Defendant—directly or through Nayax's payment and wallet Services—with highly sensitive Private Information, including, but not limited to, his name, contact information, Social Security number, financial account information, and payment card and cardholder data. Upon information and belief, this Private Information was maintained within the Nayax network and cloud environment that were subject to unauthorized access and exfiltration in the Data Breach, and Plaintiff Long's Private Information was therefore among the data compromised in the incident.

112.    Since the Data Breach, Plaintiff Long has experienced a noticeable increase in spam and other unwanted contacts. After noticing this increase, Plaintiff Long conducted his own research and thereby learned of the Data Breach. Plaintiff Long has not received any direct notification from Defendant to date.

113.    Since the Data Breach, Plaintiff Long received a dark web notification alerting him that his Social Security number had been found on the dark web.

114.    Since the Data Breach, Plaintiff Long spends approximately one hour per week monitoring his accounts in an effort to mitigate the risk of fraud and identity theft resulting from the Data Breach. Plaintiff Long has also reset his banking passwords and frequently checks his

Credit Karma in an attempt to detect and avoid further harm. This is more time and effort than he expended before the Data Breach, and having to do so causes him anxiety.

115. Plaintiff Long is aware that cybercriminals often sell Private Information, and that once stolen, his Private Information is likely to be misused for months or even years after the Data Breach.

116. Had Plaintiff Long been aware that Nayax's computer systems and cloud environment were not secure, he would not have entrusted Nayax with his Private Information.

## PLAINTIFF AND CLASS MEMBERS' INJURIES

117. To date, Defendant Nayax has done absolutely nothing to compensate Plaintiffs and Class Members for the damages they sustained in the Data Breach.

118. Defendant Nayax has yet to offer credit monitoring services, which is inadequate when victims are likely to face many years of identity theft.

119. Nayax's lack of offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information, out-of-pocket costs, and the time they are required to spend attempting to mitigate their injuries.

120. Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

121. Plaintiffs' and Class Members' Private Information was compromised and exfiltrated by cybercriminals as a direct and proximate result of the Data Breach.

122.    Plaintiffs and the Class were damaged in that their Private Information is now in the hands of cybercriminals, sold, and potentially for sale for years into the future.

123.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

124.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

125.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses, such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

126.    Plaintiffs and Class Members face a substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information, as potential fraudsters could use that information to more effectively target such schemes against Plaintiffs and Class Members.

127.    Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss-of-value damages in related cases.

128.    Plaintiffs and Class Members have spent, and will continue to spend, significant time monitoring their financial accounts and records for misuse.

28

129.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.   Finding fraudulent charges;

b.   Canceling and reissuing credit and debit cards;

c.   Purchasing credit monitoring and identity theft prevention;

d.   Monitoring their medical records for fraudulent charges and data;

e.   Addressing their inability to withdraw funds linked to compromised accounts;

f.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.   Placing "freezes" and "alerts" with credit reporting agencies;

h.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.   Contacting financial institutions and closing or modifying financial accounts;

j.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

130.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

131.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

132.    Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII. Early notification helps a victim of a Data Breach mitigate their injuries; conversely, delayed notification causes more harm and increases the risk of identity theft.  Here, Nayax knew of the breach *since at least July 8, 2026,* and has not yet notified victims. Yet Nayax offered no explanation for the delay. This delay violates notification requirements and increases the injuries to Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

134.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

All persons residing in the United States whose Private Information was compromised as a result of the Data Breach involving Nayax, LLC that was publicly disclosed in or about July 2026 (the "Class").

135.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

136.    Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification.

137.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs at this time, but the number of Class Members are believed to be in the thousands.

138.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

    b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

31

d.      Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.      Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.      Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.      Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.      Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.      Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

k.      Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

139.    Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

140.    Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

141.   Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142.   Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

143.   Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

144.   Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant failed to timely notify the public of the Data Breach;

b.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

145.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### First Count
### Negligence
### (On Behalf of Plaintiffs and Class Members)

146.    Plaintiffs incorporate by reference each and every material fact of this Complaint as if fully set forth herein.

147.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of the regular course of its business operations. Plaintiffs and Class Members were entirely dependent on Defendant to use reasonable measures to safeguard their Private Information and were vulnerable to the foreseeable harm described herein should Defendant fail to safeguard their Private Information.

34

148.    By collecting and storing this data in its computer property, and sharing it, and using it for commercial gain, Defendant assumed a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

149.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

150.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

151.    Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

152.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

153.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

154.    Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiffs and Class Members and by not complying with applicable industry standards, as described herein.

155.    Defendant breached its duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice without reasonable delay.

156.    Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence per se.

157.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

158.    Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

159.    Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiffs and the Class Members had no ability to protect their Private Information that was in Defendant's possession.

160.    Defendant was in a special relationship with Plaintiffs and Class Members with respect to the hacked information because the aim of Defendant's data security measures was to

36

benefit Plaintiffs and Class Members by ensuring that their personal information would remain protected and secure. Only Defendant was in a position to ensure that its systems were sufficiently secure to protect Plaintiffs' and Class Members' Private Information. The harm to Plaintiffs and Class Members from its exposure was highly foreseeable to Defendant.

161.    Defendant owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

162.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* RESTATEMENT (SECOND) OF TORTS § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

163.    Defendant had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to compromise by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiffs and the Class include:

  a. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private

37

Information was adequately secured from impermissible release, disclosure, and publication;

b.     To protect Plaintiffs' and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems; and

c.     To promptly notify Plaintiffs and Class Members of any breach, security incident, unauthorized disclosure, or intrusion that affected or may have affected their Private Information.

164.    Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Private Information that had been entrusted to them.

165.    Defendant breached its duties of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

a.     Failing to exercise reasonable care in obtaining, retaining, securing, safeguarding, protecting, and deleting the Private Information in its possession;

b.     Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

c.     Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;

d.     Failing to adequately train its employees to not store unencrypted Private Information in their personal files longer than absolutely necessary for the specific purpose that it was sent or received;

e.     Failing to consistently enforce security policies aimed at protecting Plaintiffs' and Class Members' Private Information;

f.     Failing to mitigate the harm caused to Plaintiffs and the Class Members;

g.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

h.    Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their Private Information.

166.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

167.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiffs and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

168.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

169.    Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps to securing their Private Information and mitigating damages.

170.    As a result of the Data Breach, Plaintiffs and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to the fraudulent use of the Private Information, and closely reviewing and monitoring bank accounts, credit reports, and statements sent from providers and their insurance companies.

171. Defendant's wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

172. The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

173. Plaintiffs and the Class have suffered injury and are entitled to actual damages in amounts to be proven at trial.

**<u>Second Count</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and Class Members)**

174. Plaintiffs incorporate by reference each and every material fact of this Complaint as if fully set forth herein.

175. Plaintiffs and Class Members provided their Private Information to Defendant Nayax in exchange for Defendant's business services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

176. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

177. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

178. Plaintiffs and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

179.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

180.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

181.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

182.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

183.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

184.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

185.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class Members.

### Third Count
### Unjust Enrichment
### (On Behalf of Plaintiffs and Class Members)

186.    Plaintiffs incorporate by reference each and every material fact of this Complaint as if fully set forth herein.

187.    Plaintiffs bring this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of contract count above.

188.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

189.    Additionally, because Nayax's payment, wallet, and commerce-enablement services require the collection, processing, and secure handling of payment card data, financial account information, and other Private Information, Defendant's business model depends on the collection and use of consumers' Private Information. Defendant profited from Plaintiffs' Private Information but failed to provide the data-security protections reasonably expected and required, resulting in unjust enrichment.

190.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

191.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

192.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

193.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

194.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

195.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

196.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

197.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

198.    Plaintiffs and Class Members have no adequate remedy at law.

199.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with

43

the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

200.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

201.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**Fourth Count**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and Class Members)**

202.   Plaintiffs incorporate by reference each and every material fact of this Complaint as if fully set forth herein.

203.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

204. An actual controversy has arisen in the wake of the Defendant's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information.

205. Plaintiffs allege that Defendant's data security measures remain inadequate. Plaintiffs will continue to suffer injury because of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

206. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendant continues to owe a legal duty to secure customers' Private Information and to timely notify customers of a data breach under the common law, state law, Section 5 of the FTC Act, and various states' statutes; and

    b.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

207. The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect customers' Private Information.

208. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The

risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

209.   The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at Defendant, Plaintiffs and Class Members will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has pre-existing legal obligations to employ such measures.

210.   Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and the thousands of individuals whose Private Information would be further compromised.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for judgment as follows:

a)  For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

b)  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h) Pre- and post-judgment interest on any amounts awarded; and

i) Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: July 29, 2026                                    Respectfully submitted,

*/s/ Danielle L. Perry*
Danielle L. Perry (MD Bar No. 2602051015)
Gary E. Mason (MD Bar No. 15033)
**MASON & PERRY LLP**
5335 Wisconsin Avenue NW, Ste. 640
Washington, DC 20015
Tel: (202) 429-2290
Email: dperry@masonllp.com
Email: gmason@masonllp.com

*Attorneys for Plaintiffs*